**NOTICE**
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220758-U

NOS. 4-22-0758, 4-22-0759 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

**FILED**
December 21, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
|       Petitioner-Appellee, | ) | No. 20JA48 |
|       v.    (No. 4-22-0758) | ) | |
| Jessica J., | ) | |
|       Respondent-Appellant). | ) | |
| | ) | |
| *In re* J.S., a Minor | ) | |
| | ) | No. 21JA36 |
| (The People of the State of Illinois, | ) | |
|       Petitioner-Appellee, | ) | |
|       v.    (No. 4-22-0759) | ) | Honorable |
| Jessica J., | ) | J. Brian Goldrick, |
|       Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Harris and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's finding it was in the minor children's best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    In November 2021, the State filed motions for the termination of the parental rights of respondent, Jessica J., as to her minor children A.B. (born in August 2017) and J.S. (born in January 2016). The next month, it filed an amended motion in A.B.'s case. In March 2022, the McLean County circuit court found respondent unfit after she admitted one ground of unfitness alleged in the State's motions. After a lengthy best-interests hearing, the court found it was in the minor children's best interests to terminate respondent's parental rights.

¶ 3        Respondent appeals, asserting the circuit court erred by finding it was in the minor children's best interests to terminate her parental rights. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        A.B.'s father is Eric W., and J.S.'s father is Eugene S., who passed away during the proceedings. Eric is not a party to this appeal.

¶ 6        In April 2020, the State filed petitions for the adjudication of wardship of A.B. and J.S. The petitions alleged the minor children were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)) because their environment was injurious to his welfare based on (1) respondent's unresolved mental-health issues, (2) respondent's unresolved issues with domestic violence and/or anger management, and (3) Eric's unresolved issues with domestic violence and/or anger management. On August 27, 2020, the circuit court held the adjudicatory hearing. The court found the minor children neglected based on both respondent's and Eric's unresolved issues with domestic violence. The allegation regarding respondent's mental health was dismissed. In September 2020, the court held the dispositional hearing. The court placed the custody of J.S. with Eugene and closed J.S.'s case (No. 20-JA-49). As to A.B., the court found respondent and Eric unfit, made A.B. a ward of the court, and placed A.B.'s guardianship with the Department of Children and Family Services (DCFS).

¶ 7        When Eugene passed away, Clarence and Annette Cobbs began caring for J.S. In May 2021, the State filed a second petition for the adjudication of wardship of J.S. (No. 21-JA-36). The petition alleged J.S. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2020)) because his environment was injurious to his welfare based on (1) respondent's juvenile court involvement in A.B.'s case, (2) respondent's

- 2 -

unresolved issue of domestic violence and/or anger management, and (3) Clarence's unresolved issues of domestic violence and/or anger management. The petition next alleged J.S. was abused under section 2-3(2)(v) of the Juvenile Court Act (705 ILCS 405/2-3(2)(v) (West 2020)) because J.S. resided with Clarence and Clarence inflicted excessive corporal punishment on at least one occasion by striking J.S., causing bruising and/or injury to J.S.'s back, buttocks, and thighs. Last, the petition asserted J.S. was abused under section 2-3(2)(i) of the Juvenile Court Act (705 ILCS 405/2-3(2)(i) (West 2020)) because J.S. resided with Annette and Clarence when they inflicted or allowed to be inflicted physical injury to J.S. by other than accidental means, which caused disfigurement, impairment of emotional health, or impairment of any bodily function, in that J.S. had bruising and/or injury to his back, buttocks, and thighs. In August 2021, the circuit court held the adjudicatory hearing on the new petition. It found J.S. neglected based on the two allegations involving respondent. After a November 2021 dispositional hearing, the court found respondent unfit, made J.S. a ward of the court, and appointed DCFS as his guardian.

¶ 8      In November 2021, the State filed a filed a motion to terminate respondent's and Eric's parental rights as to A.B. As to respondent, the motion asserted respondent failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to A.B.'s welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) make reasonable efforts to correct the conditions that were the basis for A.B.'s removal from her during any nine-month period after the neglect adjudication, specifically February 15, 2021, to November 15, 2021 (750 ILCS 50/1(D)(m)(i) (West 2020)); and (3) make reasonable progress toward A.B.'s return during any nine-month period after the neglect adjudication, specifically February 15, 2021, to November 15, 2021 (750 ILCS 50/1(D)(m)(ii) (West 2020)). The State also filed a motion to terminate respondent's parental rights as to J.S. The petition alleged respondent failed to maintain a reasonable degree

of interest, concern, or responsibility as to J.S.'s welfare (750 ILCS 50/1(D)(b) (West 2020)).

¶ 9 At the March 23, 2022, adjudicatory hearing, respondent admitted she was unfit as to both minor children based on her failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor children's welfare. Eric also admitted he was unfit. After hearing the factual basis for each admission, the circuit court accepted the admissions.

¶ 10 On June 22, 2022, the circuit court commenced the best-interests hearing. (During the State's case, the hearing was continued to July 13, 2022). The State first asked the court to take judicial notice of the entire court files in both cases, and the court did so. At the State's request, the court also took judicial notice of respondent's and Eric's criminal history and pending cases. Respondent's criminal history included the following: (1) a 2010 aggravated battery conviction, (2) a 2012 misdemeanor domestic battery conviction, (3) a 2012 misdemeanor battery conviction, (4) a 2013 felony domestic battery conviction, and (5) a 2018 misdemeanor battery conviction. Respondent also had pending domestic battery and battery charges related to an April 2021 incident with Eric (McLean County case No. 21-CM-353). Additionally, respondent had charges pending for criminal damage to property, resisting a police officer, reckless driving, and "leaving the scene" for an incident in March 2022 (McLean County case No. 22-CM-200). The March 2022 incident involved respondent striking Eric with a car. The court noted that, for the pending cases, it was just considering the contents of information contained within the reports that had "already been filed as to the issues that exist in this case."

¶ 11 The State also presented the best-interests report and the testimony of Jeanetta R., the minor children's foster mother. Respondent testified on her own behalf and presented the testimony of (1) Tristy Burks, respondent's sister; (2) Sharee Conely, respondent's friend; and (3) Martha Wynn, respondent's friend. Eric testified on his own behalf.

- 4 -

¶ 12        The best-interests report recommended the termination of respondent's parental rights to the minor children. It noted that, while respondent had engaged in services, she had not demonstrated an ability to safely parent either child. The report explained domestic violence had been a concern between respondent and Eric for over two years. While respondent had engaged in domestic-violence services, she continued to engage in domestic-violence behaviors and had failed to take accountability for her actions. The report also noted respondent lacked stable employment. DCFS was not able to recommend return home to respondent in the foreseeable future, and the minor children needed permanency. The minor children's foster mother was willing to provide them permanency through adoption.

¶ 13        Jeanetta testified the minor children came into her care in April 2020. J.S. went to live with his father in September 2020 and returned to Jeanetta's home in July 2021. In addition to the minor children, Jeanetta resided with her adopted three-year-old son and a seven-year-old girl who was also a foster placement. Jeanetta also had adult children. Jeanetta considered the minor children family and had signed permanency commitment forms for them. Additionally, Jeanetta had no problem with the minor children maintaining contact with their biological families, as long as it was safe for the minor children to do so.

¶ 14        Respondent testified she had a three-bedroom apartment, and the bedrooms were furnished for the minor children. She was looking for employment and was working with a temporary employment agency. By the second hearing date, respondent had begun working at Goodwill. As to her services, respondent explained she completed substance-abuse classes in 2020, was taking parenting classes, was close to completing a domestic-violence program, and was attending individual counseling weekly. By the second hearing date, respondent had in fact completed the domestic-violence program. Respondent further testified she had visitation with

the minor children for two hours twice a month. The minor children were happy to see her and referred to her as "Mom." Respondent acknowledged she did not visit the minor children for a four-month period in late 2021 because her father had died and she had issues to work out. Respondent also testified she had a 14-year-old son and a 12-year-old daughter who resided with their father. Her older children loved the minor children. Respondent further testified she had a support system of family and friends in the area. She had not had any problems with Eric since March 2022. At the second hearing date, respondent felt she was fit to care for the minor children.

¶ 15 Burks testified she was a year younger than respondent and they had a close-knit relationship. While she had not seen the minor children since they were removed from respondent's care, she used to see them twice a week. Burks testified respondent was a very good mother and Burks had no concerns about respondent's ability to parent. According to Burks, respondent had a lot of family to provide her support.

¶ 16 Conely testified she had a child J.S.'s age and she and respondent would get together about two times a week for playdates. Conley described respondent as a loving mother who made sure her children's needs were met. She had never observed respondent get angry or act inappropriately. Conley had no concerns about respondent's ability to take care of the minor children.

¶ 17 Wynn testified she was a retired social worker and the godmother of the minor children. Wynn had met respondent and respondent's father at church. Wynn indicated respondent's father had mental-health issues and described respondent's family of origin as dysfunctional. Wynn stated she had always been a source of support for respondent. She and respondent would get together weekly before the minor children were removed. Wynn was

impressed with respondent's parenting skills. She never saw respondent lash out in anger toward the minor children. Wynn never saw anything that concerned her about respondent's care of the minor children. Wynn was aware of respondent's domestic-violence issues but believed respondent would not expose the minor children to domestic violence.

¶ 18 After hearing the parties' arguments, the circuit court took the matter under advisement. At a July 28, 2022, hearing, the circuit court announced its ruling and found it was in the minor children's best interests to terminate respondent's parental rights. The court also terminated Eric's parental rights as to A.B. That same day, the court entered written orders terminating respondent's parental rights.

¶ 19 On August 26, 2022, respondent filed timely notices of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). See Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001) (providing the rules governing civil cases also govern appeals from final judgments in all proceedings under the Juvenile Court Act, except for delinquency cases). Thus, this court has jurisdiction of the appeal pursuant to Illinois Supreme Court Rule 307(a)(6) (eff. Nov. 1, 2017).

¶ 20                                   II. ANALYSIS

¶ 21 Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2020)), the involuntary termination of parental rights involves a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006). If the circuit court makes a finding of unfitness, then the State must prove by a preponderance of the evidence it is in the minor children's best interests that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214,

1228 (2004). On appeal, respondent only challenges the best-interests finding.

¶ 22 Since the circuit court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight of the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667, 756 N.E.2d 422, 427 (2001). Further, in matters involving minors, the circuit court receives broad discretion and great deference. *E.S.*, 324 Ill. App. 3d at 667, 756 N.E.2d at 427. Thus, a reviewing court will not disturb a circuit court's best-interests determination unless it is contrary to the manifest weight of the evidence. *In re J.L.*, 236 Ill. 2d 329, 344, 924 N.E.2d 961, 970 (2010). A circuit court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 517 (2005).

¶ 23 During the best-interests hearing, the circuit court focuses on "the child[ren]'s welfare and whether termination would improve the child[ren]'s future financial, social and emotional atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772, 784 N.E.2d 304, 309 (2002). In doing so, the court considers the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West Supp. 2021)) in the context of the children's age and developmental needs. See *In re T.A.*, 359 Ill. App. 3d 953, 959-60, 835 N.E.2d 908, 912-13 (2005). Those factors include the following: the children's physical safety and welfare; the development of the children's identity; the children's family, cultural, and religious background and ties; the children's sense of attachments, including continuity of affection for the children, the children's feelings of love, being valued, security, and familiarity, and taking into account the least disruptive placement for the children; the children's own wishes and long-term goals; the children's community ties, including church, school, and friends; the children's need for permanence, which includes the children's need for stability and continuity of relationships with

parent figures, siblings, and other relatives; the uniqueness of every family and each child; the risks attendant to entering and being in substitute care; and the wishes of the persons available to care for the children. 705 ILCS 405/1-3(4.05) (West Supp. 2021).

¶ 24 We note a parent's unfitness to have custody of his or her children does not automatically result in the termination of the parent's legal relationship with the children. *In re M.F.*, 326 Ill. App. 3d 1110, 1115, 762 N.E.2d 701, 706 (2002). As stated, the State must prove by a preponderance of the evidence the termination of parental rights is in the minor children's best interests. *D.T.*, 212 Ill. 2d at 366, 818 N.E.2d at 1228. "Proof by a preponderance of the evidence means that the fact at issue *** is rendered more likely than not." *People v. Houar*, 365 Ill. App. 3d 682, 686, 850 N.E.2d 327, 331 (2006).

¶ 25 Respondent contends the circuit court placed excessive weight on the minor children's sense of attachments and need for permanency and too little weight on the minor children's potential relationship with respondent. Respondent is essentially asking this court to reweigh the best-interests factors and substitute our judgment for that of the circuit court's, which is not this court's role. Additionally, we note a review of the record shows the circuit court properly considered the factors challenged by respondent.

¶ 26 Here, the State presented ample evidence for the circuit court to find by clear and convincing evidence a weighing of the best-interests factors favored termination of respondent's parental rights. At the time of the best-interests hearing, A.B. was almost five years old, and J.S. was six years old. A.B. had lived with Jeanetta for more than two years, and Jeanetta was the only caregiver A.B. could remember. J.S. had lived with Jeanetta for over a year and had lived with her before the court gave his father custody of him. The best-interests report noted both minor children were bonded with Jeanetta, and Jeanetta sought to provide them permanence

through adoption. She provided the minor children a safe home and met their needs on a daily basis. The minor children's attachments and ties were with Jeanetta and her family and community. Moreover, Jeanetta was willing to maintain the minor children's relationships with respondent if respondent was committed to maintaining the relationship. Even with services, respondent continued to have domestic-violence incidents, with her latest one being around three months before the best-interests hearing and involving a vehicle. Her testimony about why the minor children came into care suggested she still lacked insight into her issues with domestic violence. Moreover, respondent was still in individual counseling and parenting classes. DCFS was unable to make a recommendation of returning the minor children home to respondent in the foreseeable future. The evidence demonstrated respondent could not consistently provide for the minor children's safety, which undermines respondent's ability to provide permanency for the minor children.

¶ 27    Accordingly, we find the circuit court's conclusion it was in the minor children's best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 28                    III. CONCLUSION

¶ 29    For the reasons stated, we affirm the McLean County circuit court's judgment.

¶ 30    Affirmed.