NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 210402-U

NOS. 4-21-0402, 4-21-0403 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 15, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* T.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Piatt County |
|     Petitioner-Appellee, | ) | No. 18JA35 |
|     v.  (No. 4-21-0402) | ) | |
| Amber L., | ) | |
|     Respondent-Appellant). | ) | |
|   | ) | |
| *In re* Z.M., a Minor | ) | |
| | ) | No. 18JA36 |
| (The People of the State of Illinois, | ) | |
|     Petitioner-Appellee, | ) | |
|     v.  (No. 4-21-0403) | ) | Honorable |
| Amber L., | ) | Rodney S. Forbes, |
|     Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's findings respondent was unfit under section 1(D)(m)(ii) of the Adoption Act and it was in the minor children's best interests to terminate respondent's parental rights were not against the manifest weight of the evidence.

¶ 2    In January 2021, the State filed motions for the termination of the parental rights of respondent, Amber L., as to her minor children, T.M. (born in January 2017) and Z.M. (born in November 2017). After a May 2021 hearing, the Piatt County circuit court found respondent unfit as alleged in the termination motion. At a June 2021 hearing, the court found it was in the minor children's best interests to terminate respondent's parental rights.

¶ 3    Respondent appeals, asserting the circuit court erred by (1) finding her unfit and (2) concluding it was in the minor children's best interests to terminate her parental rights. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5    The minor children's father, Zachary M., died during the pendency of this case. In August 2018, the State filed a petition for the adjudication of wardship of the minor children. The petition alleged the minor children were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)) because their environment was injurious to their welfare when they resided with respondent and Zachary in that said environment exposed the minor children to domestic violence. At a September 2018 hearing, respondent admitted the minor children were neglected as alleged in the petition, and the circuit court adjudicated the minor children neglected. After an October 2018 hearing, the court entered a dispositional order finding respondent was unfit and unable to care for, protect, train, or discipline the minor children. The order noted domestic violence had occurred within the home and a "history of drug use." The court made the minor children wards of the court and appointed the Department of Children and Family Services as the minor children's guardian and custodian.

¶ 6    In January 2021, the State filed a motion to terminate respondent's parental rights to her minor children. The motion first asserted respondent was unfit because she failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor children during any nine-month period after the neglect adjudication, specifically March 18, 2019, to December 18, 2019. See 750 ILCS 50/1(D)(m)(i) (West 2020). The motion also alleged respondent failed to make reasonable progress toward the minor children's return during any nine-month period after the neglect adjudication and set forth two nine-month periods,

- 2 -

specifically March 18, 2019, to December 18, 2019, and January 1, 2020, to October 1, 2020. See 750 ILCS 50/1(D)(m)(ii) (West 2020).

¶ 7        In May 2021, the circuit court commenced the fitness hearing. The State presented the testimony of (1) Anna Pryde-Wait, a substance abuse counselor at Rosecrance; (2) Melody Dreger, the caseworker for the minor children's case; and (3) Sairah Jahangir, a foster care team supervisor. The State also presented a letter from Dan Koenigs, respondent's counselor at the Piatt County Mental Health Center. Koenigs's letter indicated he completed an initial assessment with respondent in August 2018 and a discharge letter for respondent in December 2019. Respondent only attended three counseling sessions during the intervening period, and Koenigs described respondent's attendance as "irresponsible." However, Koenigs complained respondent's case was not handled properly because he was not provided her case plan, he was unable to clarify whether abstinence from marijuana was part of her case plan, and interventions to motivate respondent to attend counseling sessions were not implemented. Koenigs's decision no treatment recommendations were warranted was based strictly on respondent's self-reporting. Additionally, the State asked the circuit court to take judicial notice of the prior orders in this case, and the court did so.

¶ 8        Respondent did not present any testimony but did present the following exhibits: (1) Pryde-Wait's October 15, 2020, letter; (2) a March 2021 letter and treatment summary for respondent from Amy Scrimpsher of Mindful Beginnings; (3) a letter from Christa Capalby, a counselor at Rosecrance; and (4) a March 17, 2021, letter by Kara Cain, who was the minor children's foster mother in 2019 and 2020. Pryde-Wait's letter contained information similar to her testimony at the hearing which is set forth below. Scrimpsher's letter stated respondent was fully engaged in therapy. Scrimpsher noted, if respondent was required to stop using medical

marijuana to complete the required substance abuse treatment, she recommended respondent participate in specialized trauma therapy such as eye movement desensitization and reprocessing. The treatment summary showed respondent's initial appointment was in March 2020 and the most recent was in March 2021. Respondent had attended almost all her appointments. Capalby's letter noted respondent had completed a comprehensive substance abuse assessment with Rosecrance in April 2021. The assessment showed respondent did not meet the criteria for a current substance use diagnosis but recommended respondent increase her counseling to weekly one-hour sessions. In her letter, Cain stated she was the minor children's foster parent in 2019 and 2020. Cain noted respondent had always been kind and respectful to her. Cain could see respondent was trying to have her custody restored. During visits, respondent did a great job with the minor children, and the minor children looked forward to visits with her. Cain questioned why respondent's visits with the minor children were so far from respondent's residence and noted it did not seem the goal was to have the minor children returned to respondent.

¶ 9 Pryde-Wait testified she did a substance abuse assessment for respondent in October 2020. Respondent had been referred for a substance abuse assessment because of positive drug screens for methamphetamine. Respondent told Pryde-Wait she had only used marijuana since 2018. Respondent also reported she had anxiety, depression, and post-traumatic stress disorder. Based on the assessment, Pryde-Wait recommended respondent engage in intensive outpatient treatment, which was a group that met three times a week for three weeks. Rosecrance offered the treatment program, but it was an abstinence-based facility. Thus, if respondent wanted to use marijuana under her medical marijuana card, she could not have received treatment at Rosecrance. Respondent informed Pryde-Wait she would not stop smoking

medical marijuana.

¶ 10　　　　Dreger testified she was assigned to the minor children's case in April 2019. At that time, respondent had already been referred for services but had not completed any of them. Respondent's services included substance abuse monitoring as well as counseling for substance abuse and domestic violence. When Dreger received the case, Zachary, the minor children's father and respondent's paramour, had recently killed himself. Respondent was traumatized by the event and completely stopped engaging in services. Dreger understood respondent needed time to grieve.

¶ 11　　　　In November 2019, respondent slowly started to engage in services, which included participating in drug screens. Before November 2019, respondent was to complete her drug screens at Rosecrance in Champaign County and failed to appear for every drug screen. Respondent noted transportation issues and the drug screens were moved to Piatt County in November 2019. The early drug screens respondent completed were positive for tetrahydrocannabinol (THC). Dreger was aware respondent suffered from anxiety, depression, and post-traumatic stress syndrome and had a card for medical marijuana to treat those conditions. In December 2019, Dreger learned respondent was pregnant. At a meeting in January 2020, Dreger expressed her concerns about respondent using marijuana during her pregnancy. Respondent informed Dreger she was not going to stop using medical marijuana. Respondent had four drug screens that were positive for amphetamines. The positive tests were one in June 2020, two in August 2020, and one in October 2020. Respondent denied using methamphetamine and suggested the marijuana she was using may have been laced with amphetamines. In October 2020, Dreger referred respondent for a substance abuse assessment. After the substance abuse assessment, Pryde-Wait made recommendations, and respondent did

not follow through with treatment for methamphetamine use. According to Dreger, respondent's counselor gave her another treatment option so respondent could avoid using medical marijuana. From December 2020 to March 30, 2021, respondent only tested positive for THC one time.

¶ 12    As to visitation, Dreger testified that, when she received the case, respondent was offered visitation from 5 to 8 p.m. on Saturdays and 12 to 4 p.m. on Sundays at the home of Denise Bradshaw, who was the third-party supervisor and a grandmother figure to the minor children. Bradshaw lived in Vermilion County. Dreger provided gas cards and help with transportation when needed. Respondent was inconsistent in her visitation, often only showing up for two hours on a Sunday. The only time she was consistent with visitation was after respondent gave birth to her son, J.C. Once the COVID-19 pandemic started, the visits were virtual until June 2020. At some point, Bradshaw no longer agreed to supervise the visits and visits took place at the agency in Champaign County. Dreger testified respondent was not allowed unsupervised visitation with the minor children at any point during the case's pendency.

¶ 13    Additionally, in February 2020, respondent was again referred to therapy. Respondent was assigned parenting classes in J.C.'s case, and she completed the classes. Respondent also completed domestic violence counseling. Dreger was able to maintain regular contact with respondent throughout the life of the case.

¶ 14    Jahangir testified she became the supervisor over the minor children's case in March 2019. The minor children's case was initially opened in August 2018 due to a domestic dispute between respondent and Zachary. From March to December 2019, respondent was added to the calendar for random drug screening and received referrals for substance abuse counseling and a domestic violence course. Respondent failed to appear for every drug screen. Originally, the drug screens were in Champaign County, and respondent cited transportation

issues for the reason for her failed screens. Dreger and Jahangir had car parts purchased for respondent's car and arranged for a ride service. Respondent still failed to appear. In November 2019, the drug screens were moved to the Piatt County probation office. That same month, respondent obtained her medical marijuana card. Respondent explained she sought a medical marijuana card because she was leery of prescription medication and felt marijuana was the most beneficial for her anxiety and depression. Jahangir told respondent that, even with the medical marijuana card, she would have to continue to do drug screens and participate in substance abuse treatment with Koenigs. Respondent started to appear for drug screens at that time but still failed to appear on some occasions. Additionally, Jahangir testified the only concern she had with respondent's marijuana use was the screens showed respondent's THC levels were very high. Jahangir had to address very high levels of THC with respondent on multiple occasions. Jahangir was also concerned with respondent's marijuana use throughout her pregnancy with J.C.

¶ 15      As to respondent's possible substance abuse treatment at Rosecrance, Jahangir was aware respondent could not participate if she was using marijuana. However, respondent's last positive screen for THC was on December 7, 2020. Jahangir spoke with Rosecrance and learned respondent could start services since she was not using her medical marijuana. Jahangir discussed with respondent she was allowed to start services at Rosecrance but did not receive confirmation respondent had engaged in treatment.

¶ 16      Jahangir further testified she was the supervisor for the case when Zachary killed himself. Jahangir talked with respondent the day after his death. At that time, the only service respondent was actively engaged in was domestic violence classes. Jahangir told respondent she could take at least a month off from services if she needed. Jahangir also offered to make a

referral for grief counseling, but respondent declined counseling. In June 2020, respondent resumed attending domestic violence classes but not her other services. Respondent completed the domestic violence classes, and Jahangir was not aware of any other incidents of domestic violence involving respondent.

¶ 17 Moreover, Jahangir testified she had supervised some of the visits between respondent and the minor children. Respondent had third-party supervised visitation with the minor children when Jahangir began supervising the case. In November 2019, visitation was brought back to the agency for supervision due to concerns about respondent's vehicle smelling like marijuana. After several agency supervised visits, respondent's visitation returned to third-party supervision. Jahangir had no concerns about respondent's interactions with the minor children during visits. She did not doubt respondent loved the minor children and was devoted to them. Jahangir further testified the minor children were bonded with respondent and were very excited to see respondent. Respondent was never approved for unsupervised visits because of ongoing concerns about her incomplete substance abuse treatment, positive drug screens for substances other than marijuana, and multiple failures to appear for drug screens.

¶ 18 At the conclusion of the hearing, the circuit court found the State proved respondent was unfit for failing to make reasonable progress during the two nine-month periods. The court found the State had failed to prove respondent did not make reasonable efforts.

¶ 19 On June 28, 2021, the circuit court held the best interests hearing. The State only presented the best interests report. Respondent testified on her own behalf and presented the testimony of her boyfriend, Tyler C. At her request, the court also considered Scrimpsher's March 2021 letter and treatment summary.

¶ 20 The best interests report stated the minor children had been living in the same

foster home since March 2020 and were thriving in their placement. The minor children were bonded with their foster parents, who were willing to provide the minor children with permanency. The report further indicated respondent had her parental rights terminated to four other children. The minor children had been in foster care longer than they were in respondent's care. According to the report, the minor children got emotional before and after visits. As to respondent, the report noted she had lived with Tyler since May 2019 and in their current residence since August 2019. Respondent had been attending therapy biweekly since 2020 and was receiving substance abuse services at Rosecrance. Respondent had stopped using marijuana and other drugs. Respondent was very loving and attentive to the minor children. The report recommended respondent's parental rights be terminated.

¶ 21　　　　　Tyler testified he was respondent's paramour and the father of J.C. He had lived with respondent for almost two years. Tyler had been present for respondent's visits with the minor children. According to Tyler, the minor children's faces lit up when they saw respondent, and the minor children always wanted to go home with them. Respondent and the minor children had a loving bond. Tyler also testified the minor children were bonded with J.C. From his observations, respondent could take care of three young children. Tyler was also capable of assisting respondent with the minor children. Tyler and respondent were living in a three-bedroom home, and Tyler had extended family in the area. Additionally, Tyler and respondent work at the same place.

¶ 22　　　　　Respondent testified she had seven children, two of whom she had her parental rights terminated. She still had parental rights to her oldest child, who lived with respondent's father, and another child who lived with respondent's ex-husband. Respondent disagreed her parental rights should be terminated. The minor children were bonded with her, J.C., and

respondent's oldest child. Respondent testified she was capable of caring for the minor children and denied currently having a substance abuse problem. Respondent had successfully completed probation, was no longer using drugs, was buying a house, had worked at the same place for four years, and was seeing a therapist. Tyler had his driver's license, and they had reliable transportation. Additionally, respondent noted she had completed parenting classes and domestic violence classes.

¶ 23  After hearing the parties' arguments, the circuit court found the termination of respondent's parental rights was in the minor children's best interests.

¶ 24  On July 13, 2021, respondent filed a notice of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). See Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001) (providing the rules governing civil cases also govern appeals from final judgments in all proceedings under the Juvenile Court Act, except for delinquency cases). Thus, this court has jurisdiction of the appeal pursuant to Illinois Supreme Court Rule 307(a)(6) (eff. Nov. 1, 2017).

¶ 25                    II. ANALYSIS

¶ 26  Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2020)), the involuntary termination of parental rights involves a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006). If the circuit court makes a finding of unfitness, then the State must prove by a preponderance of the evidence it is in the minor children's best interests that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004).

¶ 27  Since the circuit court has the best opportunity to observe the demeanor and

conduct of the parties and witnesses, it is in the best position to determine the credibility and weight of the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667, 756 N.E.2d 422, 427 (2001). Further, in matters involving minors, the circuit court receives broad discretion and great deference. *E.S.*, 324 Ill. App. 3d at 667, 756 N.E.2d at 427. Thus, a reviewing court will not disturb a circuit court's unfitness finding and best-interests determination unless they are contrary to the manifest weight of the evidence. See *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 516-17 (2005) (fitness finding); *In re J.L.*, 236 Ill. 2d 329, 344, 924 N.E.2d 961, 970 (2010) (best-interests determination). A circuit court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Gwynne P.*, 215 Ill. 2d at 354, 830 N.E.2d at 517.

¶ 28                               A. Respondent's Fitness

¶ 29          Respondent contends the circuit court erred by finding her unfit. In this case, the circuit court found respondent unfit on two of the three grounds alleged in the petition. The basis for the circuit court's unfitness finding was separate allegations Both grounds were brought under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)), which provides a parent may be declared unfit if he or she fails "to make reasonable progress toward the return of the child[ren] to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act." Illinois courts have defined "reasonable progress" as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046, 871 N.E.2d 835, 844 (2007) (quoting *In re C.N.*, 196 Ill. 2d 181, 211, 752 N.E.2d 1030, 1047 (2001)). Moreover, they have explained reasonable progress as follows:

          " '[T]he benchmark for measuring a parent's "progress toward the

return of the child[ren]" under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child[ren], and in light of other conditions which later became known and which would prevent the court from returning custody of the child[ren] to the parent.' " *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844 (quoting *C.N.*, 196 Ill. 2d at 216-17, 752 N.E.2d at 1050).

Additionally, this court has explained reasonable progress exists when a circuit court "can conclude that *** the court, in the *near future*, will be able to order the child[ren] returned to parental custody. The court will be able to order the child[ren] returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child[ren]." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991). We have also emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227 (quoting *L.L.S.*, 218 Ill. App. 3d at 461, 577 N.E.2d at 1387).

¶ 30         In determining a parent's fitness based on reasonable progress, a court may only consider evidence from the relevant time period. *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844 (citing *In re D.F.*, 208 Ill. 2d 223, 237-38, 802 N.E.2d 800, 809 (2003)). Courts are limited to that period "because reliance upon evidence of any subsequent time period could improperly allow a parent to circumvent her own unfitness because of a bureaucratic delay in bringing her case to trial." *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844. In this case, the petition alleged two nine-month periods, March 18, 2019, to December 18, 2019, and

January 1, 2020, to October 1, 2020.

¶ 31    In this case, respondent was required to participate in substance abuse monitoring, counseling, and domestic violence classes. She was later assigned parenting classes in a separate case when J.C. was born. As to the second nine-month period, respondent contends she completed parenting classes, got into therapy, and was prohibited from attending Rosecrance because of her medical marijuana card. She also contends she completed a substance abuse assessment but that took place after the end of the second nine-month period. Respondent had completed domestic violence classes before the second nine-month period.

¶ 32    While respondent had completed some of her services and was participating in counseling, she tested positive for methamphetamines once in June 2020 and twice in August 2020 and had missed drug screens. Respondent told Dreger she did not use methamphetamine and suggested she had bought marijuana that was laced with methamphetamine. When the positive methamphetamine result occurred multiple times, Dreger and Jahangir referred respondent for a substance abuse assessment. The evidence did not indicate exactly when they made the referral, but the evidence did show respondent did not complete the substance abuse assessment at Rosecrance until after October 1, 2020. Due to respondent's positive drug screens for methamphetamine and her continued failures to report for drug screens, Jahangir never approved respondent for unsupervised visitations. The evidence showed concerns respondent's substance use was ongoing throughout the second nine-month period, and respondent was not close to having unsupervised visitation with the minor children. Given the above evidence, the circuit court's finding respondent failed to make reasonable progress during the period of January 1, 2020, to October 1, 2020, was not against the manifest weight of the evidence.

¶ 33    Since we have upheld the circuit court's determination respondent met the

- 13 -

statutory definition of an "unfit person" on the basis of respondent's failure to make reasonable progress (750 ILCS 50/1(D)(m)(ii) (West 2020)) during the nine-month period of January 1, 2020, to October 1, 2020, we do not address the other nine-month period. See *In re Tiffany M.*, 353 Ill. App. 3d 883, 891, 819 N.E.2d 813, 820 (2004).

¶ 34                                    B. Minor Children's Best Interests

¶ 35          Respondent also challenges the circuit court's finding it was in the minor children's best interests to terminate her parental rights. The State disagrees and contends the court's finding was proper.

¶ 36          During the best interests hearing, the circuit court focuses on "the child[ren]'s welfare and whether termination would improve the child[ren]'s future financial, social and emotional atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772, 784 N.E.2d 304, 309 (2002). In doing so, the court considers the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2020)) in the context of the children's age and developmental needs. See *In re T.A.*, 359 Ill. App. 3d 953, 959-60, 835 N.E.2d 908, 912-13 (2005). Those factors include the following: the children's physical safety and welfare; the development of the children's identity; the children's family, cultural, and religious background and ties; the children's sense of attachments, including continuity of affection for the children, the children's feelings of love, being valued, security, and familiarity, and taking into account the least disruptive placement for the children; the children's own wishes and long-term goals; the children's community ties, including church, school, and friends; the children's need for permanence, which includes the children's need for stability and continuity of relationships with parent figures, siblings, and other relatives; the uniqueness of every family and each child; the risks attendant to entering and being in substitute care; and the wishes of the persons available to

care for the children.  705 ILCS 405/1-3(4.05) (West 2020).

¶ 37	We note a parent's unfitness to have custody of his or her children does not automatically result in the termination of the parent's legal relationship with the children.  *In re M.F.*, 326 Ill. App. 3d 1110, 1115, 762 N.E.2d 701, 706 (2002).  As stated, the State must prove by a preponderance of the evidence the termination of parental rights is in the minor children's best interests.  See *D.T.*, 212 Ill. 2d at 366, 818 N.E.2d at 1228.  "Proof by a preponderance of the evidence means that the fact at issue *** is rendered more likely than not."  *People v. Houar*, 365 Ill. App. 3d 682, 686, 850 N.E.2d 327, 331 (2006).

¶ 38	In asserting the circuit court's best interests finding was against the manifest weight of the evidence, respondent emphasizes all the progress she has made and her ability to parent the minor children.  However, the focus of the best interests hearing is on the minor children.  At that time, the minor children were three and four years old and had been in care for almost three years and in their current foster home for 15 months.  The minor children had been in foster care longer than they had resided with respondent.  They had adjusted well to their current foster home and appeared to be thriving.  The minor children were extremely close to their foster parents, who were willing to provide them permanency.  The best interests report noted the minor children considered their foster home as their home.  The evidence at the hearing did show the minor children had a strong bond with respondent.  However, all the factors must be weighed, and ample evidence was presented for a finding the factors favored termination of respondent's parental rights.

¶ 39	Accordingly, we find the circuit court's conclusion it was in the minor children's best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 40                                    III. CONCLUSION

¶ 41          For the reasons stated, we affirm the Piatt County circuit court's judgment.

¶ 42          Affirmed.